[Civ. No. 3136. Third Appellate District.—October 25, 1926.]

ELLA SMITH TRULL, Respondent, v. JAMES T. DUNN et al., Appellants.

[1] Quieting Title—Adverse Possession—Farm Lands—Evidence — Support of Judgment.—In an action to quiet title, evidence of adverse possession by plaintiff and predecessors which showed that the lots described in plaintiff's complaint were farmed and cultivated in the usual manner of farming and cultivating farming lands in the neighborhood where the same were situated was sufficient, under subdivision 2 of section 325 of the Code of Civil Procedure, to support the judgment quieting title in plaintiff.

---

(1) 2 C. J., p. 276, n. 59; 32 Cyc., p. 1374, n. 29.

1. See 1 Cal. Jur. 616.

APPEAL from a judgment of the Superior Court of Los Angeles County. E. N. Rector, Judge Presiding. Affirmed.

The facts are stated in the opinion of the court.

Wm. T. Kendrick and Victor H. Kendrick for Appellants.

R. D. McLaughlin and H. R. Collins for Respondent.

PLUMMER, J.—Plaintiff commenced this action to quiet title to thirteen lots situate in the town site of Howard, formerly the town site of Rosecrans, in the county of Los Angeles. Judgment was awarded the plaintiff, from which judgment the defendants Dunn appeal.

The complaint alleges that the plaintiff is the owner and for a long time preceding the filing of the complaint was and has been the owner of said lots, in the possession of and entitled to the possession thereof, and that the defendants assert some interest therein adverse to the plaintiff, and that such asserted claim or interest is without right of title. The defendants answered by denying the ownership and possession of the plaintiff and also denied that the claims of the defendants are without right.

While the answer of the defendants does not allege title in the defendants or ask any affirmative relief from the court, the course of the trial and the testimony introduced shows that the defendants attempted to establish title in themselves to the premises in controversy. The record shows that on the fourteenth day of May, 1887, the title to all the property described in the complaint as well as a much larger tract was owned by one Jotham Bixby. On the said fourteenth day of May, Jotham Bixby bargained, granted, sold, and conveyed to Emil R. d'Artois and Adelaide d'Artois the south half and the northwest quarter of section twelve (12) in township three (3) south, range fourteen (14) west, San Bernardino Meridian, being a part of the Rosecrans tract and containing 480 acres of land, situate in Los Angeles County, state of California. On the sixth day of July, 1892, Emil R. d'Artois granted, bargained, sold, and conveyed to Adelaide d'Artois the following described lands situate in Los Angeles County, state of California: The

northwest quarter of the west half of the northeast quarter
of section twelve (12), township 3 south, range 15 west,
S. B. M., containing 240 acres of land. Also all the right,
title, and interest of the first party in and to the town site
of Rosecrans, as per the recorded map of said town site.
Also lot No. three (3) of the Mondon tract, as per the
recorded map of said tract, containing about five acres.
Also, all the right, title, and interest of the party of the
first part in and to a certain tract of land situate on the
southwest corner of Cypress and Vermont Avenues, contain-
ing about four and two-fifths acres of land. "And all of
the right, title, and interest of the party of the first part
in and to any and all real estate owned by him & situated
in said County of Los Angeles, California. It being the
intention of the grantor herein to convey to grantee by this
deed, all of the real estate that he now owns in said county."
On the seventeenth day of September, 1892, Adelaide
d'Artois remised, released, and forever quitclaimed to W. E.
De Groot, all and singular, the following described real
property situate in the county of Los Angeles: "All of the
right, title and interest of the party of the first part in and
to all the lots in the Townsite of Rosecrans in the county
aforesaid as per the recorded map of said townsite to which
reference is hereby made for further description." On the
third day of November, 1892, W. E. De Groot remised,
released, and forever quitclaimed to James T. Dunn, one
of the defendants in this action, certain described property
situate in the county of Los Angeles, state of California,
to wit: Here follows a description of 64 lots included in the
town site of Rosecrans, as per map of said town site recorded
in book 22, pages 59 *et sequitur*, miscellaneous records of
Los Angeles County; and 2d, "All interest as record owner
to all lands lying within the boundary lines of said town-
site of Rosecrans excepting lots 22 & 23 Blk. 69, Townsite
of Rosecrans." The lots specifically described in this con-
veyance remising and quitclaiming property to the defend-
ant do not include any of the lots claimed by the plaintiff
herein. They are only included, if included at all, in the
following words which we have quoted from said instru-
ment of conveyance, to wit: "All interest as record owner
to all lands lying within the boundary lines of said town-
site of Rosecrans," etc.

On the nineteenth day of April, 1900, Emil R. d'Artois and Kate D. d'Artois, his wife, granted, bargained, sold, and conveyed to Fred Smith, now deceased, then the husband of the plaintiff, the following described real property situate in the county of Los Angeles, state of California: "Lots 16, 17, 18, and 19, Block 58; Lots 8, 9, 11, 12, Block 85; Lot 11, Block 81; Lot 18, Block 83; Lot 24, Block V; and Lots 25 and 26, Block 80 of the Townsite of Howard, formerly Rosecrans; and which is a subdivision of the south ½ of sec. 12, township 3 north; range 14 west, S. B. M., and which subdivision is recorded in Book 22, page 59 *et sequitur*, of the miscellaneous records of Los Angeles County."

On the twentieth day of October, 1913, a decree of distribution was entered in the matter of the estate of Fred Smith, deceased, distributing to the plaintiff, together with other property, all and singular the real estate described in the conveyance from Emil R. d'Artois and Kate D. d'Artois to Fred Smith hereinbefore set forth.

It thus appears that on the sixth day of July, 1892, Emil d'Artois conveyed to Adelaide d'Artois all the real estate which he then owned situate in the county of Los Angeles. Just what Adelaide d'Artois conveyed to W. E. De Groot by the instrument executed on the seventeenth day of September, 1892, is left somewhat in doubt. This instrument, in its granting clause, reads as we have stated: "All of the right, title and interest of the party of the first part in and to all the lots in the Town of Rosecrans in the county aforesaid as per the recorded map of said townsite to which reference is hereby made for further description." The map was not introduced in evidence and the lands covered by the conveyance are not anywhere particularly described. Likewise, the deed executed the third day of November, 1892, between W. E. De Groot and the defendant James T. Dunn is uncertain and indefinite, save and except as to the 64 lots therein described, as it refers only to other lands by the following words: "All interest as record owner to all lands lying within the boundary lines of said townsite of Rosecrans excepting lots 22 & 23 Blk. 69, Townsite of Rosecrans." The testimony shows that there were between 300 and 400 lots in the town site of Rosecrans and just what property this general clause or blanket provision in the deed under con-

sideration refers to is not made to appear other than as herein stated.

The conveyance executed and delivered by Emil R. d'Artois and Kate D. d'Artois, his wife, to Fred Smith, the immediate predecessor of the plaintiff, was made some eight years after Emil R. d'Artois had executed the instrument dated July 6, 1892, purporting to convey all his right, title, and interest in and to the town site of Rosecrans; also, all real estate then owned by him situate in the county of Los Angeles.

The plaintiff claims title by adverse possession, alleging that she and her grantor entered under color of title and had adversely possessed the premises for more than five years preceding the commencement of the action. The defendants deny the adverse possession of the plaintiff, and, while not asking for any affirmative relief in their answer, have introduced in testimony the conveyances to which we have referred and argue therefrom that the defendants have the legal title to the premises in controversy. This contention of the defendants, however, is not made good by reason of the failure of proof to show what lands are included within the words, "all interest as record owner of all land lying within the boundary lines of said townsite of Rosecrans." The testimony shows that in the year 1908 James T. Dunn, the defendant herein, having a son named John J. Dunn, told his son that he might farm all of his property in the town site of Howard by paying a nominal rent therefor. This lease was a verbal one. The testimony of the son is that his father said: "Go ahead and farm all of my lands. Farm my entire interest in the Howard town site." Nowhere does it appear from the testimony that there was any definite agreement as to the particular land to be farmed. John J. Dunn then proceeded to farm all but two of the lots in controversy and the large tract of land belonging to the defendant. His testimony is as follows: "I farmed, plowed and sowed land other than the land described in the complaint (referring to the 13 lots). I refer to the land adjoining, land which is a part of that tract. All told I farmed about 320 to 330 acres. . . . All the lands were farmed alike regardless of their location. James T. Dunn claimed to own about 300 or 400 lots, scattered around that whole tract. There are 24 to 26 lots in some blocks and 48 lots in others.

I rented a few lots of two or three different parties—probably 100 lots. . . . My father claimed to own personally probably one-third of the whole tract. I farmed quite a good deal of the tract without getting the agreement—probably one-third of it."

On October 26, 1912, Fred Smith, the immediate predecessor of the plaintiff herein, visited the premises now in controversy and John J. Dunn executed and delivered to him a writing in the following words and figures: "This is to certify that I, J. J. Dunn, as tenant for Fred Smith, the owner, have farmed the following described lots, situate in the townsite of Howard (formerly Rosecrans) for the years 1909, 1910, 1911 and 1912, and have same rented for the year 1913. . . . " (Here follows a description of the lots described in the complaint and also certain others.) Thereafter said John J. Dunn continued to farm the premises included in this case and paid rent to Fred Smith, and after his death to the plaintiff herein every year up to and including the year 1918. The premises were unfarmed during the years 1919 and 1920 and thereafter were rented to a party named Charles Lang. The record shows that lots 25 and 26 in block 80 were not farmed by John J. Dunn, but were farmed by another person as tenant of the plaintiff. The record also shows that the plaintiff and her predecessor in interest have paid all the taxes on said premises from about the date of the conveyance thereof to plaintiff's immediate predecessor until the time of the beginning of this action. The record shows that the rental paid to the plaintiff was about one dollar per lot per annum.

The contention of the appellant is that John J. Dunn was the tenant of James T. Dunn and that said John J. Dunn entered into possession of the lots claimed by the plaintiff as a tenant of James T. Dunn, and that any attornment made by him to the plaintiff was void under the provisions of section 1948 of the Civil Code, which reads: "The attornment of a tenant to a stranger is void, unless it is made with the consent of the landlord, or in consequence of a judgment of a court of competent jurisdiction." The record, as we have said, is to the effect that John J. Dunn was to farm the interest of James T. Dunn in the town site of Howard. He was not rented any land except that in which James T. Dunn might have an interest.

The testimony also leaves it very doubtful as to whether John J. Dunn ever paid James T. Dunn any rental for the use of the lands in controversy. The testimony of John J. Dunn in this particular is set out in the transcript as follows: "I don't remember whether I agreed to pay him anything or not. He was to receive a part of the crop—fourth interest. I commenced in 1908. My father and I had a conversation at that time. Then I did farm the land. I farmed it every year. At least for the first few years I delivered father the hay. He had a fuel and feed store. He sold his portion down there. When he sold the yard, he couldn't use the hay so I sold it and paid the taxes." It may here be stated that the taxes paid did not include any of the taxes assessed against the lands in controversy. This witness further continued: "I met Fred Smith in 1911. During the time from 1908 right up to 1919 except one or two years when I wasn't able to, I paid my father. I paid Smith a little. I don't know how much, very little. I just paid him to get rid of him. I was farming all of these lots they now claim to belong to Smith and I knew what lots they were. I paid him a little payment every year. . . . I planted and plowed the lots described in the complaint every year, sowed them either in barley or oats. It was sometimes barley, sometimes oats."

The record shows that John J. Dunn was farming the lots belonging to his father, the lots claimed by the plaintiff for which he paid rent to the plaintiff and a number of other lots belonging to other people, with whom he had no agreement and to whom he paid no rent. It may be, as contended by appellant, that the son did not say anything to his father about paying rent to the plaintiff for the simple reason that he was farming a much larger tract of land of which his father only owned one-third, and, therefore, would have no interest in what the son may have paid to the owners of other lands, or whether he paid them anything. From the indefinite language used in the verbal lease, if such it may be called, from James T. Dunn to his son, John J. Dunn, the trial court was justified in concluding that the lots in controversy were not included in the premises claimed by the appellant. The record shows that the appellant during all the years the lots in controversy were farmed by John J. Dunn never paid any taxes on the lots claimed by the plain-

tiff and never listed the same in his assessments, which, as stated in *Janke* v. *McMahon,* 21 Cal. App. 781, 787 [133 Pac. 21], is strongly persuasive that the appellant did not then claim the premises in controversy, never intended to rent the same, that they were not included within the terms of the verbal lease and only became of interest to the appellant by recent events giving some possible value to the lots in the town site of Howard.

[1] The record shows that the lots described in the plaintiff's complaint were farmed and cultivated in the usual manner of farming and cultivating farming lands in the neighborhood where the same were situated and, therefore, subdivision 2 of section 325 of the Code of Civil Procedure applies.

It would serve no useful purpose to enter into a discussion of the acts necessary to constitute adverse possession. The trial court had the witnesses before it and the testimony set out in the record we think sufficient to support the findings of that court to the effect that the plaintiff and her predecessor in interest acquired title to said premises by adverse possession, that John J. Dunn was their tenant, that he never was the tenant of James T. Dunn as to the lots in controversy, and that the acts performed by the plaintiff and her predecessor in interest and tenant justified both the findings and conclusion of the trial court in favor of the plaintiff.

The judgment is affirmed.

Finch, P. J., and Hart, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on November 24, 1926, and the following opinion then rendered thereon:

THE COURT.—Appellants in their petition for rehearing state that "the case stated in the opinion of the above-entitled court differs materially from the case as it appears in the record in the following particulars" and then refers to the testimony of John J. Dunn, the son of the defendant, James T. Dunn, as to the lands leased to the said John J. Dunn by the defendant James T. Dunn, the opinion stating: "Nowhere does it appear from the testimony that there was

any definite agreement as to the particular land to be farmed.'' A reference to folio 167 of the transcript setting forth the testimony of John J. Dunn will show that we have quoted the language of the witness word for word as to the land leased by father to son for the purpose of being farmed by the son.

Exception is also taken to the statement of the court as to the payment of taxes by the plaintiff and, also, to the statement in the opinion that the defendant had paid no taxes on the property, and that the lots in controversy were never listed by him for assessment purposes, and the effect of such failure, as shown by the case of *Janke* v. *McMahon*, 21 Cal. App. 781, 787 [133 Pac. 21]. This part of the opinion was not material to a decision of the cause for the reason that it dealt with the weakness of the defendant's asserted title in an action where the plaintiff must prevail upon the strength of her own title, but was in answer to the argument made by the defendants upon this appeal. The language of this court should have been that the evidence was amply sufficient to satisfy the trial court that the defendants had not paid taxes on any of the lots in controversy, and had not for a period much longer than that required by the statute of limitations listed any of the lots for assessment purposes. Just for the sake of accuracy in this particular, we have re-examined the testimony in this case and find the following: That the plaintiff claims under a color of title by a deed made and executed on the nineteenth day of April, 1900, conveying all the lots in controversy to the then husband of the plaintiff and a subsequent decree of distribution dated October 30, 1913, distributing all of the lots in controversy to the plaintiff.

The testimony of Ella. Smith Trull was directly in point to the effect that the taxes levied upon the property were paid by her husband during his lifetime, and after his death, up to some time about the year 1922, since which date the taxes were paid on the premises in controversy by a bank, when they were turned over in trust to a bank to secure certain advances.

The testimony of the witness R. D. McLaughlin shows that the taxes on several of the lots, just how many not stated, were not paid and the same became delinquent and were sold. His testimony is as follows: ''I made a memo-

randum and checked that with the receipts that she gave me from the years 1907 to 1916, inclusive. At that time we redeemed everything up to and including 1916. The tax receipts brought down by Mrs. Trull, and which I went over covered the years 1907 to 1916, inclusive. I checked the receipts for the redemptions of all the lots during that period."

This is very persuasive evidence that the defendants had not paid the taxes on the lots. The record does show that for the year 1913 lot 24 in block D, lots 25 and 28 in block 80, and lots 11 and 12 in block 85 were assessed to the defendant James T. Dunn, but in 1916 lots 25 and 26, block 80, and lots 11 and 12 in block 85 were assessed to Ella Smith, now Ella Smith Trull.

The same is true for the year 1922 as to lot 24 and lots 25 and 26, *supra*. In 1917, 1918, 1919, all the property described in the complaint, with the exception of one lot, to wit, lot 24 in block V, was assessed exclusively to the plaintiff.

This record we think sufficiently showed to the trial court that the defendant was not listing said lots until the controversy herein arose, and then only listed a few of the lots described in plaintiff's complaint for a very short period of time.

The testimony of the plaintiff is to the effect that when she discovered that the defendant James T. Dunn had had his name inserted on the assessment-roll as to two of the lots in 1917, she called upon him in relation thereto.

The petition for rehearing also quotes the language of the defendant James T. Dunn as a witness in his own behalf as follows: "I paid the taxes on those lots." The context of the testimony, however, eliminates the force of this testimony. It appears in the transcript as follows: "There were two or three people that farmed a little piece at different places. There were no lots fenced. There were two lots set out in blue gum in the tract. I think there is one or two fenced. I think you can't get on it. There is no other fence. The lots I speak of are not any of those in question here. I paid the taxes on those lots." The witness then testified as to how he paid his taxes by sending a signed blank check to the tax collector. The assessment-roll of the county of Los Angeles for the years from 1907 to 1922,

inclusive, were admitted in evidence and it was stipulated that all the taxes levied upon the lots described in plaintiff's complaint during those years had been paid, but the record, however, does not disclose anything except as herein referred to.

We were slightly in error as to the year 1913 as to the assessment of the property, but it does not appear that the defendant listed the same, and the fact that for some years afterward his name does not appear on the assessment-roll as to any of these lots amply supported the statement of this court in its opinion deciding this cause.

The question of the payment of taxes was a matter primarily for the trial court in determining the question of adverse possession, and we think the record, as herein cited, justifies the conclusion of the trial court in so far as it was necessary under the law relating to adverse possession to find as to the payment of taxes.

Rehearing denied.

A petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 23, 1926.